[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 13, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-15674

_____

D. C. Docket No. 01-00090-CV-LSC-JEO

MAX LANDON PAYNE,

Petitioner-Appellant,

versus

RICHARD F. ALLEN, Commissioner,
Alabama Department of Corrections,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(August 13, 2008)

Before BARKETT, HULL and MARCUS, Circuit Judges.

HULL, CIRCUIT JUDGE:

In this capital case, petitioner Max Landon Payne ("Payne") appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. After review and oral argument, we affirm.

## I. BACKGROUND

**A.    The Crimes**

Payne robbed, abducted, and brutally murdered Braxton Brown. See Payne v. State, 683 So.2d 440, 442-47 (Ala. Crim. App. 1995). On March 23, 1992, the evening Payne murdered Brown, Payne was at his sister Wilma Faye Easterly's house with his girlfriend, Sandra Walker, and Easterly. Payne left the house with a double-barreled shotgun. Id. at 443. Payne said he was taking the shotgun in case "somebody fucks with me." Id. Around 8:25 or 8:30 p.m., two customers saw Payne at West Point Grocery, which Brown owned. Id.

Around 8:30 p.m., an alarm company operator received a "hold-up alarm" from West Point Grocery and called the sheriff's department. Id. The responding deputy discovered the store door open and saw Marlboro packs scattered on the floor, but found no one there. Id.

Payne had robbed the store, kidnapped Brown, and taken Brown at gunpoint to Easterly's house. Easterly was still there with Walker. Id. Walker testified Brown appeared very nervous and scared, and Payne had a gun, stood right next to

Brown, and had an arm sling.  Payne ordered Brown to give Easterly money.  Id.

Brown laid $20 on a table.  Id.  Walker overheard Easterly begging Payne "don't

do this" several times.  Id.

Easterly asked Payne to leave Brown with her or take him back to his store

and said "maybe [Brown] would forget about this."  Id. at 444.  Brown nodded

nervously.  Id.  Payne rejected Easterly's suggestion, stating, "No, I am going to do

this."  Id.  Payne forced Brown to leave Easterly's house with him.  Id.

Around 9:15 p.m., Payne went to George Cleghorn's house and asked to use

the telephone.  Id.  Payne called someone and asked for bullets for a .22 rifle.  Id.

Payne also asked Cleghorn if he had any bullets.  Id.  During this time, Payne's

other sister Alma Thomas went to West Point Grocery and informed police her

brother had been seen with Brown and described the car Payne was driving.  Id.

Around 10:00 p.m., a police investigator taking pictures at West Point

Grocery received a call that gunshots had been heard.  Id.  He attempted to locate

the origin of the shots but failed.  Id.  When the investigator returned to West Point

Grocery, he received a call that Brown had been seen with Payne.  Id.  Following

the report of gunshots, an investigator arrived at Easterly's house and found the car

Payne had used that evening.  Id.  Inside the car were two spent and several

unspent shotgun shells.  Id.  Around midnight, Payne purchased a bus ticket to

3

Florida.  Id.  The ticket agent noticed Payne wore torn blue jeans with blood stains and had cuts on his face.  Id.

On the morning of March 24, 1992, a volunteer fireman found a partial dental plate on a bridge over Crooked Creek and noticed dark red stains on the bridge and railing.  Id. at 445.  The search team discovered Brown's body in the creek.  Id.  Most of Brown's face was gone due to two shotgun blasts to the face.  Id.  He had two large holes in his face: one in his forehead and one in his mouth.  Id.  An autopsy later retrieved 466 shotgun pellets from Brown's skull.  Id. at 446.  A forensic examiner testified Brown was shot with a shotgun from a distance of one to one-and-a-half feet away.  Id.

On March 25, 1992, following a call from Alabama authorities, a Miami police detective met Payne's bus when it arrived in Miami.  Id. at 445.  Items found on Payne included Brown's handgun; a jeweler's invoice made out to West Point Grocery; a vehicle registration in Brown's name; three cartons of Marlboro cigarettes; three bank deposit bags containing numerous checks written to West Point Grocery, credit card receipts, rings, and food stamps; bank receipts in Brown's name; and a total of $1,085.84.  Id. at 445-46.  Brown's son identified many items as coming from West Point Grocery.  Id.  Forensic testing matched human tissue recovered from Payne's arm sling to Brown's blood type.  Id. at 446.

4

Payne was indicted for three counts of capital murder arising from Brown's death.[1]  An Alabama jury unanimously convicted Payne on all counts and recommended a death sentence by an 11-1 vote.  The state trial judge sentenced Payne to death.

## B.    Pre-trial Motions

Prior to trial, defense counsel Greg Nicholas and Robert Sapp moved ex parte for funds to investigate the crimes and mitigating circumstances.  The court granted the motion and defense counsel hired Johnny Nesmith, a retired Alabama Bureau of Investigation agent.  Counsel also moved for a court-ordered psychiatric exam to determine Payne's competency to stand trial and his mental and emotional state at the time of the offenses.  The trial court held an evidentiary hearing on the motion.

Nicholas and Sapp attended the hearing, but Sapp questioned the witnesses.  Family witnesses testified about Payne's difficult childhood, his health problems, and the physical abuse he suffered from his stepfather.  Payne's mother also

---

[1]The counts are: (1) intentional murder committed during an abduction with the intent to accomplish or aid the commission of robbery or flight therefrom; (2) intentional murder during an abduction with the intent to inflict serious physical injury; and (3) intentional murder during a robbery in the first degree.  See Ala. Code. §§ 13A-5-40(a)(1)-(2), 13A-6-2, 13A-6-43, 13A-8-41.  A person commits robbery in the first degree when he, in the course of committing a theft, (1) uses force with intent to overcome physical resistance or threatens the imminent use of force with intent to compel acquiescence to the taking of or escaping with the property; and (2) is armed with a deadly weapon or dangerous instrument or causes serious physical injury to another. Ala. Code §§ 13A-8-41, 13A-8-43.

discussed the stomach surgery Payne had as a child, and Payne's behavior around the time of the murder. Easterly testified about their abusive stepfather, Payne's medication for nerve problems, and Payne's irrationality the day before the murder. Alma Thomas discussed how Payne attempted suicide and how, after the murder, Payne was out of his mind when she drove him to the bus station. The court granted the mental evaluation motion.

Dr. Maier, a clinical psychologist and certified forensic examiner, examined Payne and found no evidence of mental illness, diminished mental capacity, or cognitive impairment. Dr. Maier reviewed Payne's psychological and psychiatric history, including Payne's history of substance abuse and current medications.

Payne denied any history of hospitalization or contact with a mental health professional for psychiatric or substance abuse reasons, but reported a long history of alcohol abuse and street drug usage. Payne was a heavy drinker since age fifteen or sixteen and for several years drank a case of beer a day. He was drinking heavily at the time of the crimes. Payne had problems with a nervous stomach since childhood and received medical help for that.

Dr. Maier's clinical assessment noted that nothing in Payne's history offered any organic explanations for Payne's alleged blackouts and rages, but that blackouts and anger outbursts were not uncommon during intoxication. Dr. Maier

6

found no evidence of cognitive impairment, memory problems, hallucinations, or delusions. Payne was oriented in time, place, and purpose, his speech was normal, and he had average or better intellectual functioning. Payne's affective state was within normal limits, and he had normal abstractive thinking and fair judgment and insight. Dr. Maier saw no sign of remorse for the crimes. Using the DSM-III, Dr. Maier diagnosed Payne as having Axis I alcohol dependence and Axis II personality disorder.

Dr. Maier also administered the Competency to Stand Trial Assessment Instrument test and found Payne was competent to stand trial. Dr. Maier noted that of the thirteen areas that the test measures, Payne had mild impairment in six areas. Payne was aware of the charges against him and the consequences of a conviction. He understood the duties of court personnel, courtroom procedure, the essential basics of plea-bargaining, and the difference between a misdemeanor and a felony. Dr. Maier believed Payne had adequate trust and rapport with his attorneys. As to Payne's mental state at the time of the crimes, Dr. Maier concluded, "Payne was highly intoxicated from alcohol, combined with '13 or 14 pain pills.'" Payne admitted consuming a case to a case and a half of beer during the six to eight hours before the crimes and drinking on his way to Florida. Dr. Maier found no evidence of any significant mental illness other than Payne's alcohol abuse problem.

7

Payne's report of things he remembered and his behavior after the crimes suggested "he did know that what he did was wrong and against the law." As to Payne's claims of blackout in recalling events surrounding the kidnapping, Dr. Maier saw no explanation for it "except that such a loss works to defendant's advantage, and could reflect temporary cerebral impairment due to the effects of alcohol-caused intoxication." Payne was "able to understand and appreciate the nature and consequence of his actions at the time of the alleged offenses." Dr. Maier concluded Payne could understand the charges against him and the court procedures and could cooperate with his attorneys. Dr. Maier stated Payne was not in need of immediate psychiatric care.

The trial court found Payne competent to stand trial. Payne's counsel did not call Dr. Maier as a witness during the trial.

## C.  Payne's Jury Trial

At Payne's trial, the State presented thirty witnesses, who recounted various details of the crimes. The defense presented eleven witnesses including two of Payne's sisters, his mother, and Nesmith. After the jury unanimously convicted Payne, the penalty phase began. The State adopted the evidence from the guilt stage.

Payne's counsel presented mitigation evidence through five witnesses:

Payne's mother (Gredell Thomas), sisters Easterly and Alma Thomas, Dr. Jack Coleman, and Dr. David Lairmore. The family witnesses' testimony covered Payne's childhood and dysfunctional family, the neglect by Payne's biological father, the physical abuse by Payne's alcoholic stepfather, Payne's witnessing repeated abuse of his mother and sister, and Payne's use of alcohol at an early age as well as his extensive alcohol and drug abuse. Witnesses at both the guilt and penalty phases testified about Payne's abuse of drugs and alcohol on the day of the murder.

Because Payne's federal petition claims his trial counsel was ineffective and should have presented more evidence about his childhood and substance abuse, we detail what counsel did present during Payne's jury trial.

Payne's mother testified first about Payne's childhood. Payne was the youngest of five children. Payne's mother divorced Payne's father, an alcoholic, because he was abusive and violent toward her. Payne's stepfather, Pervis Mims, was also an alcoholic. Mims often physically abused Payne and Payne's siblings. Payne never received any professional help for the abuse he endured and witnessed.

Payne was a sickly child who "got made fun of" and beat up by other boys. Payne began drinking around fifth grade. When he was thirteen, Payne moved

9

away from home so the kids would not pick on him. Payne loved his sisters and would try and stop his mother from whipping them. His mother identified several pictures of Payne as a child.

Easterly did not remember their biological father being in the house and did not know of any contact between their father and Payne until he was about twelve years old. However, Easterly knew a lot about Payne's stepfather. Mims physically abused Payne. Indeed, about once or twice a month, from when Payne was seven until he left home around age twelve or thirteen, Mims beat Payne in the face, stomach, or anywhere. Payne even witnessed Mims molest his older sister Evelyn on several occasions. Payne left home because he could not take this abuse anymore. Payne was passed from relative to relative. Payne was drinking quite a bit by age fifteen.

Nonetheless, Payne was always there for Easterly. If Easterly got in trouble, Payne would tell their mother he did it so their mother would whip Payne instead. Payne was there for Easterly when she had miscarriages and helped with her daughter's doctor bills. The week before the murder, Payne was upset because his wife said their baby was not his. Payne went to a doctor to get something for his nerves. Payne's drinking got worse, going from every two or three days to every day.

10

Payne's oldest sister, Alma Thomas, lived with her grandparents from age twelve and was not around Payne much as a child. However, in the four years before the murder, Thomas spent a lot of time with Payne. Thomas described Payne as the best friend she ever had, someone who would do anything for anybody. Payne was great with Thomas's fifteen-year-old son, building him a treehouse and encouraging him to stay in school. The day of the murder, Payne was acting crazy and did not know what he was doing.

The next witnesses were Dr. Coleman and Dr. Lairmore. About three months prior to the murder, Dr. Coleman treated Payne for nausea, vomiting, abdominal pain, and diarrhea. Payne also said he was having anxiety and tension about some family problems. Dr. Coleman diagnosed Payne with viral gastroenteritis. Dr. Coleman prescribed medicine for Payne's stomach problems and Ativan for the tension and anxiety. Dr. Coleman also explained how Ativan and alcohol interact. Ativan, a drug similar to Valium, is a calming agent to quiet down anxiety attacks. When Ativan is combined with alcohol, the drugs have a sedative effect and cause drowsiness. A person, however, could go through an excitable phase before he passes out, like how people who come out of anaesthesia can go through a combative stage. If Payne took the Ativan in excess of the dosage prescribed and in conjunction with alcohol, Payne could lose his reasoning

11

abilities. Because alcohol and Ativan are both depressants, their combination could have an effect on what a person would normally do.

A week before the murder, Dr. Lairmore treated Payne after a car accident. Payne reported neck pain, shoulder pain, and an abrasion on his hand. Payne did not indicate any mental or domestic problems or exhibit any emotional distress. Payne was neurologically normal. Dr. Lairmore ordered a sling for Payne to wear to protect his right shoulder, which was sprained. Dr. Lairmore prescribed twelve tablets of Tylenol 3, which is a combination of codeine and acetaminophen. Codeine depresses a person's mental status and causes the brain to feel less pain, but also lowers a person's mental state and makes him drowsy.

Dr. Lairmore explained alcohol's effect on the brain, how it decreases a person's reaction time and causes drowsiness and depression, and that one symptom of an alcohol overdose is blackouts. A person of Payne's general health, age, and physical status who consumed twelve to sixteen cans of beer over six or seven hours would probably be legally intoxicated. The person's reasoning ability could be altered, especially in combination with a narcotic like codeine. Alcohol and codeine together produce a multiplied effect.

The State called no rebuttal witnesses. After the jury recommended a death sentence, the state trial judge held a separate sentencing hearing a month later.

12

**D.    State Trial Court's Sentencing**

The state trial court considered the evidence presented at trial and the sentencing hearings, the jury's advisory verdict, and Payne's presentence investigation report. The court found one statutory aggravating circumstance: the capital offense was committed while the defendant was engaged in robbery and kidnapping offenses. The court found one statutory mitigating circumstance: Payne was then 21 years old.

The court also found four nonstatutory mitigating circumstances: (1) Payne was under the influence of prescription drugs and alcohol at the time of the offenses; (2) Payne was undergoing emotional problems concerning the alleged non-paternity of a child he thought was his; (3) Payne's childhood experience was bad because of his stepfather's alcohol problems and "assaulting" of Payne's sister, his mother's numerous marriages, and a generally poor childhood environment; and (4) Payne currently appeared to have a good relationship with his family. The court concluded "the mitigating circumstances in this case do not outweigh the sole aggravating circumstance" and imposed the death sentence.

**E.    Direct Appeal**

Ten days after sentencing in 1994, the state trial court appointed new counsel for Payne. At that time, Alabama had a procedural rule, established by <u>Ex</u>

13

parte Jackson, 598 So. 2d 895 (Ala. 1992), which required new appellate counsel

to raise ineffective-trial-counsel claims in a motion for new trial and then on direct

appeal (as opposed to waiting until collateral proceedings).  However, Payne's new

appellate counsel did not file a motion for new trial and did not raise any

ineffective-trial-counsel claims on direct appeal.[2]

The Alabama Court of Criminal Appeals (the "Alabama Appeals Court")

and the Alabama Supreme Court affirmed Payne's convictions and death sentence.

See Payne, 683 So. 2d at 458; Ex parte Payne, 683 So. 2d 458, 474 (Ala. 1996).

The United States Supreme Court denied certiorari.  See Payne v. Alabama, 520

U.S. 1146, 117 S. Ct. 1319 (1997).

**F.      Rule 32 Petition and First Appeal**

Payne, through another new counsel, filed a post-conviction-relief petition

pursuant to Alabama Rule of Criminal Procedure 32.[3]  Payne's Rule 32 petition

raised claims of: (1) ineffective assistance of trial counsel for failure to investigate

---

[2]Under Alabama's procedure, new appellate counsel must obtain the trial transcript in order to be able to raise ineffective-trial-counsel claims on direct appeal.  The Alabama Supreme Court in Jackson recognized that when new counsel is appointed to represent a defendant on direct appeal, "it is unlikely that the reporter's transcript will be made available to him before the 30-day period within which to file a motion for a new trial has expired."  Jackson, 598 So. 2d at 897.  The Jackson court instructed that if new appellate counsel is appointed, that counsel may file a motion with the trial court within 14 days of appointment to suspend the running of the 30-day period to file a motion for new trial until the court reporter has filed the trial transcript.  Id.  After appellate counsel receives the trial transcript, "[a]ppellate counsel will then have the means to raise all appropriate issues before the trial court" in a motion for new trial.  Id.

[3]The same counsel represented Payne in the state and federal collateral proceedings.

14

and present expert mental health evidence and adequate mitigation evidence; and (2) ineffective assistance of appellate counsel for not pursuing ineffective-trial-counsel claims in a motion for new trial or on direct appeal. The state Rule 32 court denied Payne's petition.

The Rule 32 court held Payne's ineffective-trial-counsel claims were barred because Payne's appellate counsel did not raise those claims in a motion for new trial or on direct appeal as required by Alabama law in Jackson. See Jackson, 598 So. 2d at 897. The Rule 32 court also denied Payne's ineffective-appellate-counsel claims. Payne appealed. The Alabama Appeals Court affirmed the Rule 32 court's denial of Payne's ineffective-trial-counsel claims, noting "the procedure outlined in Ex parte Jackson, 598 So. 2d 895 (Ala. 1992), was in effect" for Payne's case. Payne v. State, 791 So. 2d 383, 389-90 (Ala. Crim. App. 1999). The Alabama Appeals Court concluded Payne's ineffective-trial-counsel claims were procedurally barred because they were not raised in a motion for new trial or on direct appeal. Id. at 390.

The Alabama Appeals Court remanded the case to the Rule 32 court for an evidentiary hearing on Payne's ineffective-appellate-counsel claim. Id. at 393.

## G. Evidentiary Hearing on Rule 32 Remand

On remand, the Rule 32 court held an evidentiary hearing on Payne's

15

ineffective-appellate-counsel claims. Because we ultimately must determine if Payne's Rule 32 evidence was new or simply cumulative of what the jury and sentencing judge heard, we detail Payne's Rule 32 evidence at length.

The first witness, Gregory Nicholas, was one of Payne's trial attorneys. He testified about his experience, trial preparation, and strategy. Nicholas began law practice in 1985, was a solo practitioner, and had a general practice, a third of which was criminal cases. He had handled felony and violent felony cases, and this was his first capital case. Nicholas was appointed in 1992 and received some assistance from Capital Resources, an organization assisting lawyers in capital trials. Nicholas also attended a seminar hosted by Capital Resources at least a year before the trial. Capital Resources provided a notebook full of sample motions, the most current case law, and information on the guilt phase, penalty phase, and evidentiary issues. Nicholas used the information from Capital Resources in preparing Payne's case. During Nicholas and his co-counsel's preparation, they also contacted Capital Resources with specific questions.

Nicholas moved for a court-ordered mental exam because Payne had issues as a child and "to make sure all the bases were covered," stating:

> I talked with [Payne] early on. There had been some issues that he had as a child that certainly we wanted all those explored. I'm not a mental health professional and we just wanted to make sure all the bases were covered. We wanted that assistance. . . . I didn't have any

16

real concerns about [Payne]'s competency to stand trial after talking with him. But again, we wanted to make sure we had done the things we needed to do. If there were some underlying problems, we wanted some assistance with them.

Nicholas used court-supplied funds to hire Nesmith. Nicholas believed Nesmith "contacted some folks in Mobile and Saraland, but I'm not sure." These included a doctor who testified at trial about treating Payne in 1991 and one of Payne's good friends.[4]

As to the penalty phase, Nicholas explained their strategy was to highlight Payne's difficult life, stating:

> [Payne] had had a very difficult upbringing, to say the least. He had had a traumatic childhood. His father was very abusive at a very early age. [Payne] had started drinking when he was in the fifth or sixth grade. He had left home and went out on his own at a very early age . . . . Right before this incident had occurred with Braxton Brown, [Payne] had had some upsetting news regarding a son that he had. I believe [Payne] had just learned that his wife's child may not have been his child. And that another individual that [Payne] had a relationship with, may have a child that was [Payne]'s child. I mean, [Payne] loved kids and that was obviously upsetting to him also.

The defense interviewed Payne's family members and friends, including his mother, two sisters, a brother-in-law, and a couple of friends. The defense introduced evidence about Payne's traumatic childhood and physical abuse, his

---

[4]Nicholas believed Nesmith's charges went over the $1500 limit and Nesmith spent more than the allotted 50 hours. Since Payne's trial, Nicholas moved residences and law offices and was unable to locate his trial file for this case.

drinking, his discovery his child may not have been his, and how upsetting this was to Payne.

Nicholas decided not to present evidence of Payne's prior employment history because it "had not been real good. [Payne] had not had a job that he had held for a long period of time." They decided not to present evidence of Payne's jail behavior because of an incident that occurred "that we did not want the jury to really know about," and they were concerned it would come out if jail personnel testified.[5]

Nicholas and Sapp considered Payne's medical history, and decided to present the evidence through Dr. Coleman and Dr. Lairmore. Nicholas knew Payne was in an accident, but did not specifically recall a head injury. Dr. Coleman treated Payne for his nervous stomach. Dr. Lairmore, who examined Payne after his accident, gave no indication of a head injury or that Payne was complaining of a head injury. Dr. Lairmore testified about substance abuse. Nicholas tried to obtain information about Payne's alcohol and drug abuse. Because Payne had never been hospitalized or treated for his drug or alcohol abuse,

---

[5]During the Rule 32 hearing, Payne's counsel called jail administrator Bryan Bueglar. Bueglar remembered some disciplinary incidents involving Payne, but could find no records. Bueglar testified that Payne was "high risk . . . violating every kind of security rule or regulation that we had that could be imagined." Bueglar testified that "[f]rom time to time [Payne] would get angry, and we would have to move him from his cell to another cell. Really, he was a management problem for us."

Nicholas obtained the information from Payne. Payne's mother and sisters testified about Payne's history of drinking at a young age and another witness was aware Payne was drinking and taking medication.

Nicholas considered presenting evidence of cognitive impairments. When asked whether he believed Payne was mentally impaired based on his two years of interaction with Payne, Nicholas stated, "I don't believe that he was mentally impaired as far as having any kind of mental illness. At the time of the offense, I believe he was probably intoxicated and was using the drugs and alcohol." Nicholas did not see any indication of impairment regarding education or possible mental retardation. Both Nicholas and Sapp received Dr. Maier's report, which indicated Payne was competent to stand trial and did not need psychiatric care. Dr. Maier's report noted Payne was drinking heavily at the time of the crimes, but contained no indication Payne was under duress or domination by another person. Had there been indications of duress or domination in the report, Nicholas would have presented that to the jury.

Nicholas and Sapp presented evidence about emotional stress and Payne's intoxication at the time of the offenses. In using Payne's family members, Nicholas and Sapp "wanted to highlight as much as possible how tragic [Payne's] early life was." All the evidence from the guilt phase was also part of the penalty-

19

phase evidence.  After Payne was sentenced, Nicholas withdrew and new appellate counsel was appointed.

Easterly also testified about Payne's family history and childhood.  Payne was the youngest, and she was his closest sibling.  Easterly lived with her mother when Payne was born and grew up with him.  When Easterly married at age seventeen, Payne moved with her.  Easterly had no memory of her father.  Her first memory of her stepfather was that he backhanded her over a recliner.  Payne was a sickly child who "never was real popular," never played sports, and "was more like a loner."  Payne was generally smaller than other children his age.  Payne was always in fights; other boys would push him down, face first in the gravel.  Payne started some of these fights, although one time it was for a mentally retarded boy who was getting picked on.

Easterly first saw Payne drink alcohol when he was seven or eight.  Payne's stepfather Mims supplied Payne with alcohol.  Easterly described weekend trips to turkey shoots that Payne often went on with his stepfather as "basically fifty or more or less drunk men."  Payne witnessed Mims molest his sister Evelyn, which bothered Payne.  One time he was going to try and call 911 to stop the abuse and "got beat up pretty bad for that."

Payne was around two or three years old when their stepfather Mims first hit

him. Mims also turned a china cabinet over on their mother and kicked and broke

her ribs. Payne would either jump into the fighting or run away and hide. Their

mother spanked Payne with a belt. Payne received no counseling for witnessing

the physical abuse of his mother, the sexual abuse of his sister, or his early alcohol

use.[6]

Payne's Rule 32 counsel also submitted affidavits from: (1) Dr. Frank Gersh,

(2) Dr. Lawrence Maier, and (3) Payne's mother.[7] Frank Gersh, a

licensed psychologist, detailed what he had learned about Payne's social history,

head injuries, substance abuse, stress at the time of the murder, and stepfather's

physical abuse of multiple family members and sexual abuse of one sister. Gersh

never met Payne and based his opinion on conversations with Payne's attorney and

his review of the state court criminal record. Gersh opined that given Payne's

background, "there is a substantial basis for concluding that a

psychological/neuropsychological evaluation should have been conducted prior to

trial" and "a reasonably competent attorney would have obtained an expert

_____

[6]Payne's Rule 32 counsel also proffered that Easterly would provide testimony about an incident in which Payne's mother, hospitalized with broken ribs because of Mims, ripped the IVs out of her arms to come home from the hospital and stop Mims from beating Easterly. Easterly would also testify about seeing Mims beat her sister Evelyn.

[7]Although the parties argue about the admissibility of the affidavits, the Rule 32 court ruled that "all affidavits will be admitted." Other relevant evidence before the Rule 32 court included Dr. Maier's pre-trial report, Payne's medical records, Payne's jail medical records, and two letters from Payne to Buegler regarding jail visitation.

21

evaluation in the case at hand." Gersh's supplemental affidavit explained he would not want to offer an opinion on Payne's case "without neuropsychological assessment to determine whether or not there is normal brain functioning, and personality assessment to look at personality functioning."

In his affidavit, Dr. Maier had no personal recollection of examining Payne and did not have a copy of his written report. All of Dr. Maier's data and notes from his 1992 evaluations had been destroyed. Dr. Maier reviewed the court orders in the case and stated he "would have performed an evaluation only with regards to the two issues of whether the defendant was mentally competent to stand trial and whether the defendant was insane at the time of the offense." His report would not directly address the issue of diminished capacity or any mitigation issues. "In order to perform a thorough evaluation with respect to factors of mitigation, more extensive social, medical, and educational history regarding the defendant would have been required and a more extensive interview and testing process conducted."

An affidavit from Payne's mother discussed his childhood. While pregnant with Payne, she smoked a pack of cigarettes a day and drank alcohol occasionally. When she was six months pregnant, her brother struck her forcefully in the stomach. She does not recall anything else unusual about her pregnancy or

22

Payne's birth. She separated from Payne's father Patrick because of Patrick's heavy drinking and physical abuse. Payne's father was gone before Payne was a year old and saw Payne only a half-dozen times before Payne was twelve. Payne's stepfather physically assaulted her in Payne's presence and physically abused Payne. Payne's male role models were alcoholic and physically violent.

Payne did okay in school through the third grade. Payne was smart before he started school and was able to do his sister's math problems at a young age. In the fourth grade, Payne started to exhibit behavior problems. Payne's mother was called in several times to talk with teachers about Payne's behavior. Payne was always a small child and sick from age nine to eleven. Payne had trouble eating and frequent, severe stomach pain. The doctors recommended Payne not engage in physical activity so he could not play ball or ride bikes. He was bullied and teased by other children. Payne came home from school almost every day in the fourth grade with torn clothes, bruises, or scrapes. Payne's mother described him as "the whipping boy in the neighborhood." Payne lost interest in school and began to exhibit poor performance.

When Payne was eleven, he had surgery to correct his intestines. Payne's mother hired a tutor to teach him at home. Even then, children would stand on the edge of the property and tease Payne. Payne did not complete eighth grade. At

age twelve, he went to live with his father in Texas, returned briefly, then went back to Texas. During this time, Payne's mother divorced Mims because of the physical violence which Payne witnessed. Mims also physically abused Payne. Payne's mother sought medical treatment only once for all the abuse she received. Payne never received counseling or treatment for substance abuse, being a victim of physical abuse, or seeing his stepfather abuse his mother and sisters.

## H.     State Rule 32 Court's Second Order

After the evidentiary hearing, the Rule 32 court denied Payne's Rule 32 petition, concluding Payne's appellate counsel was not ineffective. The court found trial counsel was not deficient in obtaining and presenting mitigation evidence or expert mental health evidence, and thus new appellate counsel was not ineffective for failing to raise those trial-counsel claims. In addition, the court found Payne "has not shown that the deficient performance prejudiced [him]."

The court pointed out trial counsel moved for a psychiatric exam to determine Payne's competency to stand trial and mental state at the time of the offenses. After examining Payne, Dr. Maier reported Payne was drinking heavily at the time of the crimes and had a history of alcohol abuse. Dr. Maier found no evidence of mental disease, defect, or diminished capacity. The court found trial counsel had made pre-trial investigation of Dr. Lairmore, Dr. Coleman, and family

24

members, and presented their testimony to the jury. The court noted trial counsel

filed a motion for funds to hire an investigator, which was granted.[8]

The Rule 32 court pointed out both new appellate counsel and prior trial

counsel Sapp had not been called as witnesses and "Nicholas stated that it was

Sapp who handled the mental/psychological part of the pretrial motions while

Nicholas handled the change of venue motion." The court noted (1) only Nicholas

testified but he had lost his files since the trial and (2) Payne, although present at

the hearing, did not testify as to his relationship and preparations with his trial

counsel, nor any deficiencies in counsel's performance.

The court determined the Rule 32 petition "deals not so much with the fact

that certain evidence was not brought out, but that it was not presented in precisely

the same manner, or in the same detail as Rule 32 counsel would have liked." The

court found trial counsel's decisions about whether to present evidence of mental

impairment, alcohol abuse, family dysfunction and non-family testimony as

mitigation evidence "were all trial strategy decisions based upon the investigations

---

[8]The Rule 32 court quoted trial counsel's pre-trial motion as stating: "Counsel is required to obtain information [relevant] to Mr. Payne's medical history, educational history, employment[ and] training history, family and social history, [and any] religious and cultural influences. [Therefore, c]ounsel must direct an investigator to obtain records from all doctors, hospitals, schools, [and] employers, [and] interview people with knowledge of the[se] aspects of Mr. Payne's background." Trial counsel's motion does say this, as modified by the few words shown in brackets. During the Rule 32 hearing, Nicholas testified that Nesmith's investigation ultimately focused "primarily on investigating fact witnesses . . . for the guilt phase."

25

of the attorneys and the investigator, discussions and conferences with the family members and the evidence which counsel knew that the prosecution possessed." The court found, in any event, that Payne had not shown any deficient performance prejudiced him. Payne appealed.

## I.    Alabama Appeals Court's Second Rule 32 Decision

The Alabama Appeals Court affirmed the denial of Payne's Rule 32 petition. Payne v. State, 791 So. 2d 383, 394, 401 (Ala. Crim. App. 2000).[9] The Alabama Appeals Court noted that to succeed on his ineffective-appellate-counsel claims, Payne must establish his underlying ineffective-trial-counsel claims were meritorious and had they been raised, the outcome of his direct appeal would have been different. Id.

The Alabama Appeals Court reviewed the Rule 32 court's findings and observed the Rule 32 court found: (1) Payne underwent a psychiatric exam to determine his competency to stand trial and his mental state at the time of the offenses; (2) information regarding the investigation of Payne's head trauma from an automobile accident was made available to the jury; (3) trial counsel believed Payne was competent to stand trial, but requested a mental evaluation because of

---

[9]Both the Alabama Appeals Court's first opinion remanding the case to the Rule 32 court, dated July 9, 1999, and its second opinion, dated February 25, 2000, are in the same published document. See Payne v. State, 791 So. 2d 383 (Ala. Crim. App. 1999).

26

Payne's unusual childhood and underlying mental problems; and (4) no expert findings suggested Payne suffered mental or emotional duress at the time of the offenses or that he could not appreciate the criminality of his conduct. Id. at 400-01, 407.

As to expert mental health evidence, the Alabama Appeals Court concluded "Payne has not shown that his trial counsel's failure to present expert testimony on his mental health was outside the wide range of reasonable professional assistance." Id. at 401 (quotation marks omitted). As to the prejudice prong, the Alabama Appeals Court stated that "[a]dditionally, Payne ha[s] not shown that additional testimony about his mental health would have changed the outcome of his trial." Id. Because Payne's underlying ineffective-trial-counsel claims were not meritorious, the Alabama Appeals Court concluded Payne "failed to prove by a preponderance of the evidence that his appellate counsel was ineffective for failing to present [those claims]." Id.

As to mitigation evidence generally, the Alabama Appeals Court concluded the Rule 32 court "adequately assessed and rejected the evidence presented to support Payne's contention that his trial [counsel] fail[ed] to investigate and to present adequate mitigation evidence." Id. at 405. The Alabama Appeals Court adopted, and quoted at length from, the Rule 32 court's second order discussing (1)

27

trial counsel's investigation into Payne's medical, educational, employment, family, and social history; (2) the amount of background material gathered on Payne's life and presented to the jury by Payne's mother and sister; (3) the failure to call appellate counsel as a witness at the Rule 32 hearing; and (4) how trial counsel's decisions about whether to present evidence of mental impairment, alcohol abuse, family dysfunction, and non-family testimony were trial strategy decisions. Id. at 405-07.[10]

The Alabama Appeals Court rejected Payne's argument that trial counsel presented insufficient mitigation evidence, stating:

> Numerous witnesses testified during the guilt phase about Payne's consumption of alcohol on the day of the offense and about the various forms of physical abuse that Payne suffered and witnessed. Additionally, evidence was presented from Payne's physicians concerning his mental and emotional faculties and the effects of drug and alcohol consumption [on] his faculties. That evidence was also placed before the jury during the penalty phase. In light of the evidence presented during the guilt phase and the penalty phase of the trial, we conclude that Payne's trial counsel was not ineffective for not presenting additional evidence. Thus, appellate counsel was not ineffective for not raising such a claim.

Id. at 407-08. Because Payne's trial counsel was not ineffective, and thus his appellate counsel was not ineffective for failing to raise ineffective-trial-counsel

---

[10]As to Payne's argument that trial counsel should have presented evidence of his confinement history, the Alabama Appeals Court noted trial counsel decided not to present the evidence because Payne violated jail policies and rules. 791 So. 2d at 407.

claims, the Alabama Appeals Court affirmed the denial of Payne's Rule 32 claims.

Id. at 408. The Alabama Supreme Court denied certiorari. Ex parte Payne, 791

So. 2d 408 (Ala. 2000).

## J. Federal Habeas Petition

Payne's § 2254 petition then challenged his death sentence, claiming his trial

and appellate counsel were ineffective. The district court rejected Payne's

ineffective-trial-counsel claims as procedurally barred under Alabama's Jackson

rule. The district court also rejected Payne's argument that his allegedly

ineffective appellate counsel constituted cause and prejudice for his failure to

timely raise the ineffective-trial-counsel claims.

Alternatively, the district court addressed the merits of Payne's ineffective-

trial-counsel claims, but mainly through the lens of whether appellate counsel was

ineffective for failing to raise those trial-counsel claims. The district court

reviewed the state courts' determinations that Payne's trial counsel was not

ineffective in investigating and presenting mental health and adequate mitigation

evidence, and thus appellate counsel was not ineffective for not raising such

claims. The district court concluded Payne failed to show the state courts'

decisions are contrary to, or involved an unreasonable application of, Supreme

Court precedent or are based on an unreasonable determination of the facts. The

district court denied Payne's § 2254 petition and application for a COA.

This Court granted Payne a COA on whether his ineffective-trial-counsel claims were procedurally barred under Alabama's Jackson rule and on his ineffective counsel claims as to expert mental health and mitigation evidence.

## II.  STANDARD OF REVIEW

In examining a district court's denial of a § 2254 habeas petition, "we review questions of law and mixed questions of law and fact de novo, and findings of fact for clear error."  Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1208 (11th Cir. 2007).  We review de novo whether a particular claim is procedurally defaulted.  See Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001).

Payne filed his federal habeas petition after April 24, 1996, and thus the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, governs this appeal.  Under AEDPA, our review of a final state habeas decision is "greatly circumscribed and is highly deferential to the state courts."  Crawford v. Head, 311 F.3d 1288, 1295 (11th Cir. 2002).  First, "a determination of a factual issue made by a State court shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Henyard v. McDonough, 459 F.3d 1217, 1240 (11th Cir. 2006), cert. denied, __ U.S. __,

30

127 S. Ct. 1818 (2007). Second, § 2254(d) allows federal habeas relief for any claim adjudicated on the merits in state court only where the state court adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Henyard, 459 F.3d at 1240.

### III. DISCUSSION

### A.    Alabama's Procedural Bar

At the time of Payne's convictions and sentence in 1994, the Alabama Supreme Court had a procedural rule that required new appellate counsel to raise any ineffective-trial-counsel claims in a motion for new trial and on direct appeal and provided that failure to do so resulted in a bar of that issue in post-conviction proceedings. See Ex parte Jackson, 598 So. 2d 895, 897 (Ala. 1992); Bryant v. State, 739 So. 2d 1138, 1140 (Ala. Crim. App. 1998) (discussing how Jackson required newly appointed appellate counsel to raise ineffective-trial-counsel claims).

Both the Rule 32 court and the Alabama Appeals Court held Payne's

ineffective-trial-counsel claims were procedurally barred by the <u>Jackson</u> rule.[11]

<u>See</u> <u>Payne</u>, 791 So. 2d at 389-90.  Thus, the Alabama courts rejected Payne's

ineffective-trial-counsel claims on a state procedural ground.  "A state court's

rejection of a petitioner's constitutional claim on state procedural grounds will

generally preclude any subsequent federal habeas review of that claim."  <u>See</u> <u>Judd</u>,

250 F.3d at 1313.

Nonetheless, for a state procedural ruling to preclude federal review, the

state ruling must rest upon an "independent and adequate" state ground.  <u>Id.</u>; <u>see</u>

<u>Lynd v. Terry</u>, 470 F.3d 1308, 1313 (11th Cir. 2006), <u>cert. denied</u>, __ U.S. __ 128

S. Ct. 232 (2007).  Payne does not contest that Alabama's <u>Jackson</u> rule was an

independent state ground.  Instead, Payne claims that Alabama's <u>Jackson</u> rule is

not an adequate state ground because it was not firmly established and regularly

followed by Alabama courts.[12]  We agree the state procedural rule, to be an

adequate state ground, must be one that is "firmly established and regularly

followed."  <u>Hurth v. Mitchem</u>, 400 F.3d 857, 858 (11th Cir. 2005).

_____

[11]The Alabama Appeals Court unequivocally stated that "[b]ecause Payne was represented by different counsel at trial and on appeal, any claim of ineffective assistance of trial counsel should have been raised in a motion for a new trial in order to preserve the issue for review.  Thus, the trial court correctly concluded that Payne's claims regarding ineffective assistance of trial counsel are procedurally barred . . . ."  <u>Payne</u>, 791 So. 2d at 390 (citations omitted).

[12]The State contends Payne's particular arguments on appeal about Alabama's <u>Jackson</u> rule were not fairly presented to the district court and should not be considered on appeal.  We need not resolve that issue because Payne's arguments lack merit in any event.

However, after reviewing the Alabama courts' decisions, we conclude the

Jackson procedural bar was firmly established and regularly followed by the

Alabama state courts.  See Alderman v. State, 647 So. 2d 28, 31 (Ala. Crim. App.

1994); Covington v. State, 671 So. 2d 109, 110 (Ala. Crim. App. 1995); Brown v.

State, 681 So. 2d 1102, 1103 (Ala. Crim. App. 1996); Arrington v. State, 716 So.

2d 237, 239 (Ala. Crim. App. 1997); Hartzog v. State, 733 So. 2d 461, 462 n.1

(Ala. Crim. App. 1997); Dyson v. State, 722 So. 2d 782, 787 & n.1 (Ala. Crim.

App. 1997); Bryant v. State, 739 So. 2d  at 1140.[13]  As these cases demonstrate, the

Alabama Appeals Court consistently applied Jackson's post-conviction procedural

---

[13]See Alderman, 647 So. 2d at 31 ("[The ineffective-trial-counsel claims] are barred from
Rule 32 review because the appellant did not present those claims to the circuit court in his
motion to withdraw the guilty plea or motion for a new trial. . . . 'Failure to include a reasonably
ascertainable issue in a motion for a new trial will result in a bar to further argument of the issue
on appeal and in post-conviction proceedings.'") (emphasis omitted) (quoting Jackson, 598 So.
2d at 897); Brown, 681 So. 2d at 1103 ("Ex parte Jackson provided a method whereby newly
appointed appellant counsel could discover and present all issues concerning ineffective
assistance of trial counsel on direct appeal.  The procedure outlined in Ex parte Jackson prevents
an appellant from raising ineffective assistance of [trial] counsel in a Rule 32 petition.  Here
appellate counsel did not allege ineffective assistance of trial counsel on direct appeal.
Therefore this issue is waived as an issue which could have been raised on direct appeal but was
not."); Covington, 671 So. 2d at 110 ("We agree that the petition's claim[] of ineffectiveness of
trial counsel is procedurally barred . . . .  Because the appellant was represented by different
counsel at trial and on appeal, any claim of ineffective assistance of trial counsel must be raised
in a motion for a new trial in order to preserve the issue for review."); Arrington, 716 So. 2d at
239 ("Pursuant to Ex parte Jackson, because the appellant was represented by different counsel
at trial and on appeal, any claim of ineffective assistance of trial counsel should have been raised
in a motion for a new trial in order to preserve the issue for review.  Thus, the appellant's claims
regarding ineffective assistance of trial counsel are procedurally barred . . . .") (citations
omitted); Hartzog, 733 So. 2d at 462 n.1 (holding Rule 32 petitioner's ineffective-trial-counsel
claim was procedurally barred by Jackson because new appellate counsel did not raise an
ineffective-trial-counsel claim in a motion for new trial or on direct appeal); Dyson, 722 So. 2d
at 787 & n.1 (same); Bryant, 739 So. 2d at 1140 (same).

33

bar until its overruling in Ex parte Ingram, 675 So. 2d 863 (Ala. 1996).[14]

Payne cites to Gunn v. State, 619 So. 2d 225 (Ala. Crim. App. 1993), and Ex parte Perkins, 920 So. 2d 599 (Ala. Crim. App. 2005). However, the conviction and sentence in Gunn were before Jackson was decided, and Perkins addressed a mandamus petition about discovery.[15]

Because Alabama's Jackson rule was an independent and adequate state ground, we are barred from habeas review of Payne's ineffective-trial-counsel claims unless he shows cause and prejudice to overcome Alabama's procedural bar.

## B.     Cause and Prejudice To Overcome Alabama's Procedural Bar

Payne claims cause and prejudice exist to overcome Alabama's procedural

---

[14]The Alabama Appeals Court recognized "Jackson was subsequently overruled by Ex parte Ingram, 675 So. 2d 863 (Ala. 1996)," but noted Payne was sentenced to death on June 13, 1994, Payne's trial counsel withdrew, and new appellate counsel was appointed on June 23, 1994, and thus Jackson, decided in 1992, applied to Payne's case. Payne, 791 So. 2d at 389-90. Similarly the Alabama Appeals Court applied the Jackson rule in the cases listed in note 13, supra, as the dates of conviction in those cases were between Jackson and Ingram.

[15]We reject Payne's contention that Hale v. State, 611 So. 2d 1202 (Ala. Crim. App. 1992), implies Jackson's rule was permissive, not mandatory. Hale involved a direct appeal–not a post-conviction proceeding–where new appellate counsel did not make a motion for new trial on the ineffective-trial-counsel claim as required by Jackson but attempted to make the trial-counsel claim for the first time on direct appeal. Hale, 611 So. 2d at 1205. The Alabama Appeals Court would not address the trial-counsel claim for the first time on direct appeal because the petitioner did not follow the Jackson rule. Id. While the Alabama Appeals Court stated in dicta, "any remedy for the appellant upon this issue lies in a petition for post-conviction relief," nothing in Hale holds petitioner would, in fact, receive post-conviction relief and Hale, a direct appeal case, does not even discuss whether Jackson would present a procedural bar to post-conviction relief. Id.

34

bar because his new appellate counsel rendered ineffective assistance.

Specifically, Payne argues his appellate counsel's ineffective assistance–in not

timely raising his ineffective-trial-counsel claims in state court–caused his

procedural default and prejudiced him. Payne contends his ineffective-appellate-

counsel claims are meritorious and thus he can show the requisite prejudice.

"A petitioner can establish cause by showing that a procedural default was

caused by constitutionally ineffective assistance of counsel under Strickland v.

Washington, 466 U.S. 668, 690, 104 S. Ct. 2052 . . . (1984)." Fortenberry v.

Haley, 297 F.3d 1213, 1222 (11th Cir. 2002). To show cause for failing to follow

a state procedural rule, the ineffective assistance of counsel must occur during a

stage when a petitioner had a constitutional right to counsel. See, e.g., Mize v.

Hall, __ F.3d __, No. 07-10659, slip. op. at 13 (11th Cir. July 2, 2008)

("Ineffective assistance during a stage where the petitioner had a right to counsel is

a valid excuse for failing to follow a state procedural rule.").[16] And Payne

obviously had a constitutional right to counsel in his state trial and direct appeal.

Thus, to determine cause and prejudice, we must ascertain whether Payne

---

[16]See Coleman v. Thompson, 501 U.S. 722, 755, 111 S. Ct. 2546, 2567 (1991) ("We reiterate that counsel's ineffectiveness will constitute cause only if it is an independent constitutional violation."); Mize, No. 07-10659, slip op. at 15 n.5 (instructing that "[t]he exhaustion doctrine . . . generally requires that a claim of ineffective assistance [of counsel] be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default" (ellipsis and second alteration in original) (quoting Murray v. Carrier, 477 U.S. 478, 488-89, 106 S. Ct. 2639, 2646 (1986))).

has shown ineffective appellate counsel in not timely raising his ineffective-trial-counsel claims. And to determine whether Payne has shown ineffective appellate counsel, we must determine whether Payne has shown underlying meritorious ineffective-trial-counsel claims. So, at the end of the day, whether through the lens of cause and prejudice for our procedural bar analysis or through Payne's independent ineffective-appellate-counsel claims, we ultimately must examine whether Payne's trial counsel was ineffective in the investigation and presentation of expert mental health evidence and adequate mitigation evidence. We now turn to the underlying ineffective-trial-counsel issues.

## C. Ineffective Assistance of Trial Counsel

Payne contends his trial counsel was ineffective for failing to investigate, obtain, and present sufficient mitigation evidence in the penalty phase. Payne focuses on two types of mitigation evidence: (1) expert mental health evidence and (2) more thorough and graphic detail about his family and social history.[17] The Alabama Appeals Court correctly identified Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1994), and its progeny as the governing Supreme Court precedent. See Payne, 791 So. 2d at 401.

---

[17]Payne, in passing, also contends his trial counsel failed to investigate and present evidence of his school records and employment history. Because Payne presented no evidence of his school records and employment history in his state and federal collateral proceedings, we readily conclude this claim lacks merit. Indeed, trial counsel Nicholas testified he did not present evidence of Payne's employment history because it "had not been real good."

36

To obtain relief under Strickland, Payne must show (1) counsel's performance was deficient and (2) that deficiency prejudiced him. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. Counsel's performance is deficient when it falls "below an objective standard of reasonableness," Chandler v. United States, 218 F.3d 1305, 1312 (11th Cir. 2000), which means that it is "outside the wide range of professionally competent assistance," Strickland, 466 U.S. at 690, 104 S. Ct. at 2066. Further, "omissions are inevitable. . . . [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" Chandler, 218 F.3d at 1313 (quoting Burger v. Kemp, 483 U.S. 776, 794, 107 S. Ct. 3114, 3126 (1987)). Courts conduct a highly deferential review of counsel's performance and "'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" Id. at 1314 (alteration in original) (quoting Strickland, 466 U.S. at 689-90, 104 S. Ct. at 2065-66).

To establish prejudice, "there must be a reasonable probability that, but for counsel's deficient performance, the result of the proceedings would have been different." Lynd, 470 F.3d at 1315. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2056. "A petitioner's burden of establishing that his lawyer's

37

deficient performance prejudiced his case is also high." Van Poyck v. Fla. Dep't of Corr., 290 F.3d 1318, 1322 (11th Cir. 2002). A petitioner must "affirmatively prove prejudice." Strickland, 466 U.S. at 693, 104 S. Ct. at 2067.

In Strickland, the Supreme Court addressed claims that counsel failed to investigate and present mitigation evidence. Id. at 678, 690, 104 S. Ct. at 2059-60, 2066. As to counsel's investigation, the Supreme Court explained that

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91, 104 S. Ct. at 2066. "A counsel's decision not to investigate and develop favorable evidence must be reasonable and fall within the range of professionally competent assistance." Lynd, 470 F.3d at 1316. However, "even when trial counsel's investigation and presentation is less complete than collateral counsel's, trial counsel has not performed deficiently when a reasonable lawyer could have decided, under the circumstances, not to investigate or present particular evidence." Grayson v. Thompson, 257 F.3d 1194, 1225 (11th Cir. 2001).

38

## 1. Performance Prong

As to the performance prong, both the Rule 32 state court and the Alabama Appeals Court found Payne failed to show his appellate counsel was ineffective in not raising ineffective-trial-counsel claims as to expert mental health evidence and adequate mitigation evidence. The Alabama Rule 32 court conducted an extensive evidentiary hearing on Payne's ineffective-assistance claims and thereafter issued a thorough order containing findings of fact, discussing the claims, and then denying them. In affirming, the Alabama Appeals Court repeated and adopted the Rule 32 court's findings and legal conclusions, and expanded on them. Payne, 791 So. 2d at 400-08.

Both state courts decided Payne had not shown his trial counsel's investigation and presentation of evidence in the penalty phase was ineffective. Both courts emphasized trial counsel did obtain a mental evaluation by Dr. Maier, who found no mental illness, defect, or cognitive impairment. Further, trial counsel investigated and presented significant evidence from Dr. Coleman and Dr. Lairmore about Payne's medical problems and from three family members about Payne's difficult childhood and family background, the physical abuse Payne suffered and witnessed, his medical history, his alcohol abuse, and his mental anxiety over the paternity of his child. Given all the mitigation evidence from

39

family members and doctors that was presented, the state courts concluded that because Payne had not shown ineffective trial counsel, his new appellate counsel was not ineffective in failing to raise ineffective-trial-counsel claims. We conclude Payne simply has not shown the Alabama courts' decisions on his ineffective counsel claims are (1) contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the Rule 32 proceedings. See 28 U.S.C. § 2254(d).

We add only a few comments about Payne's performance claims. As to his expert-mental-health claim, Payne, in the collateral proceedings, still has not presented any evidence of what a mental health expert would have said about Payne's mental health or how it affected Payne's behavior or mitigated his crimes. Thus, on this basis alone, Payne's mental-health-performance claim fails for lack of any evidence of what trial counsel would have learned if he had conducted more investigation. We recognize Payne did file Dr. Gersh's affidavits, but they do not contain any expert opinion about Payne's own mental health. Indeed, Dr. Gersh has never seen nor examined Payne. More importantly, in his affidavit, Dr. Gersh himself acknowledged that without conducting a neuropsychological evaluation of Payne, Dr. Gersh could not give an opinion as to Payne's mental health. Further,

40

this is not a case where there was no mental evaluation at all of a capital defendant. The state courts emphasized Dr. Maier found Payne had no cognitive impairment, mental illness, defect, or diminished capacity other than alcohol abuse and trial counsel made a strategic decision not to present Dr. Maier's report.

As to the adequacy of mitigation evidence generally, we note the sentencing state judge found four non-statutory mitigating circumstances: (1) Payne's being under the influence of alcohol and drugs at the time of the offenses; (2) Payne's emotional problems over the questionable paternity of his child; (3) Payne's poor childhood, particularly his stepfather's alcoholism and abuse; and (4) Payne's good relationship with his family. Thus, the evidence trial counsel did present already convinced the sentencing judge to find four separate mitigating circumstances, and this strongly supports the state courts' decisions that trial counsel's investigation and presentation of mitigation evidence was not deficient. The mere fact that the family members could have presented more thorough and graphic detail about the physical abuse Payne suffered and witnessed and his early substance abuse does not render counsel's performance ineffective, especially where the sentencing judge already found such circumstances were mitigating factors. The test for reasonableness is not whether counsel could have done something more or different; instead courts must consider whether the performance fell "within the

41

'wide range of reasonable professional assistance.'" Chandler, 218 F.3d at 1313 n.12 (citation omitted). Because trial counsel convinced the sentencing judge of these four mitigating circumstances, counsel's conduct did not fall outside this wide range of reasonable assistance.

In conclusion, given Strickland's strong presumption that counsel's performance was reasonable and AEDPA's deference to state court adjudications, we cannot say the Alabama courts' decisions–that Payne's trial counsel was not ineffective and thus his new appellate counsel was not ineffective for not raising ineffective-trial-counsel claims–are contrary to, or an unreasonable application of, Supreme Court precedent, or an unreasonable determination of the facts.

## 2. Prejudice Prong

Even if Payne did demonstrate that his trial and appellate counsel's performances were deficient under Strickland, Payne has not carried his burden to show there is a "reasonable probability" that, but for his trial counsel's deficient performance, the result of the penalty phase would have been different and the sentencer would not have imposed a death sentence. More specifically, "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins v. Smith, 539 U.S. 510, 534, 123 S. Ct. 2527, 2542 (2003). Thus, "the question is whether there is a reasonable probability

that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S. Ct. at 2069.[18]

We have already reviewed at length every bit of Payne's relevant evidence at the Rule 32 evidentiary hearing, whether by direct testimony or affidavits, which now enables us to succinctly evaluate the prejudice prong. For several reasons, we conclude Payne has not shown a reasonable probability that the result of the penalty phase would have been different.

First, in the collateral proceedings, Payne simply presented no new expert evidence as to his mental health or how his mental health affected his behavior or mitigated his crimes, much less how it would have changed the result of his penalty phase. Second, there was undisputed evidence of Payne's tragic childhood, the physical abuse he suffered and witnessed, and his being distraught over learning he may not be the father of his child. There was also a wealth of evidence of his early and longstanding alcohol abuse and his abuse of alcohol and drugs on

---

[18]As to mental health evidence, the Rule 32 court concluded Payne had not shown deficient performance prejudiced him. The Alabama Appeals Court said Payne had not shown additional mental health evidence "would have changed the outcome." Payne, 791 So. 2d at 401. As to mitigation evidence generally, the Rule 32 court concluded Payne had not shown counsel's deficient performance prejudiced him, but the Alabama Appeals Court did not reach the prejudice prong. See Payne, 791 So. 2d at 407-08.

On the prejudice issue, we need not decide whether we owe AEDPA deference to the Rule 32 court's decision or only to that of the Alabama Appeals Court because we conclude that even under de novo review Payne has not carried his burden to establish the requisite prejudice.

43

the day of his crimes. Indeed, the sentencing judge already found four mitigating circumstances based on the evidence trial counsel did present. The majority of Payne's evidence in the collateral proceedings was cumulative of what the jury and judge heard at trial.

Third, as we recounted earlier and as the Alabama Appeals Court found, the evidence of Payne's guilt was "strong and convincing." Payne, 683 So. 2d at 443. And Payne's murder of Brown was particularly brutal, with Brown being robbed and then held hostage, only to be shot twice in the face with a shotgun at close range and dumped in a creek. The strength of the evidence of both Payne's guilt and the aggravating nature of the crimes is great. Some more detailed mitigating evidence about Payne's childhood, family background, and substance abuse would not have negated the aggravating nature of this abhorrent murder proven beyond all doubt by the State. As we have noted, "'[m]any death penalty cases involve murders that are carefully planned, or accompanied by torture, rape, or kidnapping.'" Grayson, 257 F.3d at 1228 (alteration in original) (emphasis omitted). "In these types of cases, this court has found that the aggravating circumstances of the crime outweigh any prejudice caused when a lawyer fails to present mitigating evidence." Dobbs v. Turpin, 142 F.3d 1383, 1390 (11th Cir. 1998). None of the mitigating circumstances present, nor any that could be found

in the more detailed explication of Payne's background in the Rule 32 proceedings, would have detracted significantly from the gruesome crimes Payne committed. Significantly, the sentencing judge even found the four mitigating circumstances detailed above, but still concluded the multiple mitigating circumstances did not outweigh the aggravating nature of Payne's crimes. Thus, under all the facts of this case, Payne has not carried his burden to establish the requisite prejudice to prevail on his ineffective-counsel claims.

## IV. CONCLUSION

We affirm the district court's denial of Payne's § 2254 petition.

**AFFIRMED.**

BARKETT, Circuit Judge, specially concurring:

I concur in the majority opinion with the exception of its conclusion that the performance prong of the test established in Strickland v. Washington, 466 U.S. 668, 688, 691 (1984), was met in this case.  Considering the defendant's aberrant behavior—for example, handing the victim the clip from his gun during the course of the kidnapping—as well as his history of family abuse and chemical dependence, I believe counsel was ineffective for failing to obtain the opinion of a mental health expert who could have addressed Payne's conduct and mental health condition and informed counsel of any relevant mental health mitigation evidence.[1] However, because I agree that Payne failed to show prejudice, I concur that he has not met his burden under Strickland.

---

[1]  Both the majority and the state court point to the evaluation conducted by Dr. Maier to support their respective findings that the performance of Payne's trial counsel was not deficient. However, as Maier himself noted, this court-directed examination focused on Payne's competency to stand trial and the potential for an insanity defense.  It did not investigate other mental health issues that might have been offered as mitigation evidence.