# SUPREME COURT OF THE UNITED STATES

_____

No. 20A110 (20–6570)

_____

## BRANDON BERNARD *v.* UNITED STATES

ON APPLICATION FOR STAY AND PETITION FOR WRIT OF
CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[December 10, 2020]

The application for stay of execution of sentence of death presented to JUSTICE ALITO and by him referred to the Court is denied. The petition for a writ of certiorari is denied.

JUSTICE BREYER and JUSTICE KAGAN would grant the application and the petition for a writ of certiorari.

JUSTICE SOTOMAYOR, dissenting from the denial of certiorari and application for stay.

Today, the Court allows the Federal Government to execute Brandon Bernard, despite Bernard's troubling allegations that the Government secured his death sentence by withholding exculpatory evidence and knowingly eliciting false testimony against him. Bernard has never had the opportunity to test the merits of those claims in court. Now he never will. I would grant Bernard's petition for a writ of certiorari and application for a stay to ensure his claims are given proper consideration before he is put to death.

The prosecution sought the death penalty for Bernard partly on the theory that he was "likely to commit criminal acts of violence in the future." Electronic Case Filing in No. 2:20–cv–00616, Doc. 3 (SD Ind., Nov. 24, 2020) (App. Vol. I), p. 46 (ECF). To prove Bernard's future dangerousness, the prosecution repeatedly invoked his gang affiliations, see *id.*, at 389–422, in particular emphasizing that all members of his gang were supposedly "equal." See, *e.g., id.*, at 379

("Q: . . . And did you ever have a conversation . . . regarding everyone being equal in the gang? A: Yes, sir"). By claiming that all gang members were equal, the prosecution in turn argued that Bernard was as dangerous as any other member of the gang and was destined for a life of violence in prison. See, *e.g., id.*, at 414 ("Q: [What happens] when . . . a new . . . gang member comes onboard to the federal prison system[?] A: Well, for one, he would have to, what they call, 'make your bones.' You have to earn being a gang member, which means you have to commit a crime, or what we consider a Bureau of Prisons violation"). The strategy worked: The jury found that Bernard posed an ongoing risk to the safety of others and, ultimately, recommended the death penalty.[1]

Nearly two decades later, in a resentencing proceeding for one of Bernard's co-defendants, the prosecution called Sergeant Sandra Hunt, the former head of the Gang Unit in the Police Department for Killeen, Texas. Sergeant Hunt testified that she had told the prosecution before Bernard's trial that the gang Bernard had been associated with was not composed of equal members. Instead, it was a thirteen-tier hierarchy with Bernard at the very bottom. Sergeant Hunt also produced a pyramidal diagram, developed in consultation with a government informant, to illustrate the gang's structure. Both Sergeant Hunt's testimony and this diagram conflicted heavily with the prosecution's characterization during Bernard's sentencing of the gang's flat structure and Bernard's position within it. Hunt's testimony also made clear that the prosecution had known about this diagram when it tried Bernard. See ECF Doc. 3, p. 226 ("Q: Did you at that time, at our request, go back to see if any of the identities of any of the other people who

_____

[1] We now know the prosecution's predictions about Bernard's future dangerousness were entirely inaccurate. Bernard has not committed a single disciplinary infraction in his two decades in prison.

were involved in that were on this chart? A: Yes, I did"); *id.* ("Q: And did you locate the individual known as Brandon Bernard on this chart? A: I did").

Soon after Sergeant Hunt's testimony, Bernard moved for relief from his death sentence in federal district court. According to Bernard, the Government never disclosed Sergeant Hunt's opinion that he was on the periphery of the gang or the existence of the diagram illustrating his subordinate role.[2] With this information, Bernard argued, he could have undermined the prosecution's case that he was an equal participant in gang activity and posed the same risk of future dangerousness as other gang members. Thus, Bernard claimed, the Government had violated its obligation to turn over exculpatory evidence under *Brady* v. *Maryland,* 373 U. S. 83 (1963), and had elicited knowingly false testimony concerning his role in the gang in violation of *Napue* v. *Illinois,* 360 U. S. 264 (1959).

The Court of Appeals for the Fifth Circuit denied Bernard's motion without considering his *Brady* and *Napue* claims on the merits. 820 Fed. Appx. 309 (2020) (*per curiam*). According to the Fifth Circuit, because Bernard had already petitioned for relief from his death sentence in the past, his current motion was subject to the strict rules that apply to second or successive petitions. Those rules, which

—————

[2] The Government argues that, because it chose not to call Sergeant Hunt until years after Bernard's trial, it could not have improperly suppressed an expert opinion "that had not yet been expressed." See Brief in Opposition 23. But Sergeant Hunt's testimony confirms that she offered her opinion on the gang's structure and the status of members within it (including Bernard) to the prosecution at the time of Bernard's trial. The Government also argues that, before trial, it disclosed to Bernard's defense the existence of a handwritten version of the same diagram as a possible exhibit. Whether that constitutes proper disclosure under *Brady* and mitigates Bernard's claim is the type of issue best resolved by the district court in the course of evaluating Bernard's claims on the merits.

are designed to encourage inmates to raise promptly all ob-
jections to their conviction, require a petitioner filing a sec-
ond-in-time petition to produce "newly discovered evidence
. . . sufficient to establish by clear and convincing evidence
that no reasonable factfinder would have found the movant
guilty of the offense." 28 U. S. C. §2255(h)(1). This stand-
ard is far more stringent than the "'reasonable probability
of a different result'" standard that typically applies to
*Brady* claims. *Banks* v. *Dretke*, 540 U. S. 668, 699 (2004)
(quoting *Kyles* v. *Whitley*, 514 U. S. 419, 434 (1995)).

The Fifth Circuit got it wrong. Its illogical rule conflicts
with this Court's precedent, and it rewards prosecutors who
successfully conceal their *Brady* and *Napue* violations until
after an inmate has sought relief from his convictions on
other grounds. This Court held in *Panetti* v. *Quarterman*,
551 U. S. 930 (2007), that the restrictions on second-or-suc-
cessive petitions do not apply to a claim that was not ripe
when the inmate filed his first-in-time petition. *Id.,* at 945.[3]
Any other rule would have troubling consequences, as *Pan-
etti* explained. Through no fault of their own, inmates
would "'run the risk' . . . of 'forever losing their opportunity
for any federal review of their unexhausted claims.'" *Id*., at
945–946 (quoting *Rhines* v. *Weber*, 544 U. S. 269, 275
(2005)). Consequently, "conscientious defense attorneys
would be obliged to file unripe (and, in many cases, merit-
less) . . . claims in each and every" case to preserve claims
in case they later became ripe. 551 U. S., at 943.

*Panetti*'s reasoning applies with full force to *Brady*
claims. As in *Panetti*, applying the bar on second-or-succes-

---

[3] In other words, as JUSTICE BREYER explained in *Magwood* v. *Patter-
son*, 561 U. S. 320 (2010), "*Panetti*'s holding [is] that an application con-
taining a claim that the petitioner had no fair opportunity to raise in his
first habeas petition is not a second or successive application." *Id.,* at
343 (opinion concurring in part and concurring in judgment) (internal
quotation marks omitted).

sive habeas petitions to *Brady* claims "would produce troublesome results, create procedural anomalies, and close [the courthouse] doors to a class of habeas petitioners seeking review without any clear indication that such was Congress' intent." 551 U. S., at 946 (quoting *Castro* v. *United States*, 540 U. S. 375, 380–381 (2003); internal quotation marks omitted). Take the present case. How exactly was Bernard supposed to have raised a *Brady* claim more than a decade ago when he brought his first habeas petition, given that he was unaware of the evidence the Government concealed from him?

Yet that is what the Fifth Circuit's rule demands.[4] That rule perversely rewards the Government for keeping exculpatory information secret until after an inmate's first habeas petition has been resolved. Prosecutors who successfully conceal their violations avoid accountability so long as they can show that the withheld evidence would not "be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense." 28 U. S. C. §2255(h)(1). Under this rule, prosecutors can run out the clock and escape any responsibility for all but the most extreme violations.

---

[4] The Fifth Circuit's ruling follows that of several other Circuits. See, *e.g., Tompkins* v. *Secretary, Dept. of Corrections*, 557 F. 3d 1257, 1260 (CA11 2009). Those decisions suffer from the same fatal flaws, as recognized by judges across the Courts of Appeals. See *Long* v. *Hooks*, 972 F. 3d 442, 486 (CA4 2020) (Wynn, J., concurring) ("[T]o subject *Brady* claims to the heightened standard of §2244(b)(2) is to reward investigators or prosecutors who engage in the unconstitutional suppression of evidence with a 'win'"); *Scott* v. *United States*, 890 F. 3d 1239, 1258 (CA11 2018) (arguing that the Eleventh Circuit's decision adopting the same rule as the Fifth Circuit's should be reconsidered en banc because it "is fatally flawed" and fails "to adhere to—or even to attempt to apply— the *Panetti* factors"); *Gage* v. *Chappell*, 793 F. 3d 1159, 1165 (CA9 2015) ("Under our precedents as they currently stand, prosecutors may have an incentive to refrain from disclosing *Brady* violations related to prisoners who have not yet sought collateral review").

If the prosecution had not committed the *Brady* and *Napue* violations Bernard alleges, there is a reasonable probability Bernard would have been spared a death sentence. By all indications, the jury's decision to sentence him to death was anything but easy. See, *e.g., In re Bernard*, Petition for Clemency Seeking Commutation of Death Sentence, Exh. E–1 (Nov. 10, 2020) (Dec. of Juror Gary McClung, Jr.) ("The penalty phase was not as easy for me. I was uncomfortable giving Mr. Bernard the death penalty and have been bothered with my decision since trial"). The jury rejected the death penalty on two of Bernard's three death-eligible convictions. Five of the nine jurors at Bernard's trial now either support or do not oppose a clemency petition to commute his death sentence to life in prison. See *id.*, Exhs. A–I. Against that backdrop, there is a reasonable probability that evidence casting doubt on a centerpiece of the Government's theory that Bernard posed a risk of future dangerousness would have been enough to persuade just one juror to reject the death penalty.

That is all that is required for relief under *Brady* and *Napue*. Yet because of the Fifth Circuit's rule, Bernard's claim was rejected without fair consideration of its merits. Bernard should not be executed before his claims have been tested under the correct standard. Nor should others like him find themselves procedurally barred by similarly perverse and illogical rules. For those reasons, I would grant Bernard's petition and application for a stay.